# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

AMANDA J. POGOTIS,    )
            )
   Plaintiff,     )
            )
   v.        )   CAUSE NO.: 3:15-CV-343-TLS
            )
CAROLYN COLVIN,    )
Acting Commissioner of the Social )
Security Administration,   )
            )
   Defendant.    )

## OPINION AND ORDER

The Plaintiff, Amanda J. Pogotis, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits. She claims that she is disabled by a combination of physical and mental conditions that cause pain, fatigue, and mental limitations.

## PROCEDURAL HISTORY

In October 2012, the Plaintiff filed a claim for disability insurance benefits (DIB), alleging disability beginning in August 2012. The state agency responsible for making disability determinations on behalf of the Commissioner denied the Plaintiff's claim initially and upon reconsideration. The Plaintiff sought appeal of those determinations and filed a request for a hearing before an Administrative Law Judge (ALJ). In March 2014, the Plaintiff, who was represented by an attorney, appeared and testified at a hearing before ALJ Christa Zamora. The ALJ also heard testimony from a vocational expert (VE). In April 2014, the ALJ issued a written decision, in which she concluded that the Plaintiff was not disabled because she retained the

residual functional capacity to perform a reduced range of light work, including her past relevant

work as a supervisor cashier, bookkeeper, cashier/checker, paraprofessional, and reading teacher.

The Plaintiff sought review of the ALJ's decision by the Appeals Council. In June 2015, the

Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner. *See* 20 C.F.R. § 404.981. The Plaintiff seeks judicial review under 42 U.S.C.

§ 405(g).


## FACTUAL BACKGROUND

**A.     Medical Evidence**

**1.      *Pre Onset Date Evidence***

    In August 2008, the Plaintiff's lung cancer necessitated surgery to remove a portion of

her right lung. By December 2008, a pulmonary function test showed no abnormalities. In March

2011, the Plaintiff went to her treating oncologist, Bilal Ansari, M.D., with complaints of some

weight loss and chest pain, but no complaints of difficulty breathing. Dr. Ansari's examination

noted nothing remarkable and he found no signs of metastatic disease. He referred the Plaintiff to

a pain management specialist and told her to follow up with him in one year.

    The Plaintiff then began treatment with a pain management specialist, Angela Stillwagon,

D.O., to address complaints of neck, back, and rib pain. At the time, the Plaintiff was working

part-time as a cashier at CVS drugstore, which required her to stand four to five hours at a time.

On examination, the Plaintiff had tenderness in her neck and rib cage, but full strength in her

muscles. Dr. Stillwagon administered trigger point injections for the Plaintiff's pain and

prescribed multiple pain medications. The Plaintiff treated with Dr. Stillwagon on a monthly

basis from April 2011 to June 2012. Although she reported temporary relief from injections, she continued to have tenderness and a diminished range of motion in her neck. Dr. Stillwagaon prescribed physical therapy, injections, medications, and a Transcutaneous Electrical Nerve Stimulation unit. A July 2011 MRI of the Plaintiffs' neck revealed mild degenerative changes and radiculopathy at several levels. Dr. Stillwagon recommended facet injections, which were administered by pain management specialist Todd Graham, M.D., in August, September, and October 2011.

The Plaintiff went to her primary care physician, Charles Higgs-Coulthard, M.D., in August and December 2011, but had no specific complaints related to her pain until January 2012. The Plaintiff had pain in her lower back and some discomfort when lying down, but had normal reflexes, strength, straight-leg raising tests, and range of motion. Dr. Higgs-Coulthard prescribed physical therapy exercises and medication.

In spring 2012, the Plaintiff had examinations with Drs. Ansari and Higgs-Coulthard, which were both unremarkable, as was a nerve study of her right wrist.

In June 2012, Dr. Stillwagon ordered a second MRI of the Plaintiff's neck; it showed mild arthropathy at several levels, but moderate narrowing at the C5-6 level, very similar to the previous MRI. Doctors assessed multilevel degenerative disc and osteoarthritic disease, which was most pronounced at C5–6, where there was mild to moderate bilateral neuroforaminal narrowing. One month later, the Plaintiff informed Dr. Stillwagon her pain was much better, and that Cymbalta had "helped tremendously." (R. 474.) The Plaintiff had some mild abnormal curvature, sensation, and tenderness in her neck, along with a reduced range of motion and a positive Suprling's Maneuver, indicative of radiculopathy. Dr. Stillwagon continued prescribing

Cymbalta and Botox injections, and recommended that the Plaintiff continue with massage and home exercises.

Also in July 2012, the Plaintiff told Dr. Higgs-Coulthard that she experienced an incident of not being able to walk straight, which lasted for 20 minutes. The Plaintiff's examination was normal, but Dr. Higgs-Coulthard ordered an MRI of her brain. The MRI showed only scattered small white matter lesions, which were "entirely nonspecific but may relate to mild small vessel ischemic changes among other etiologies." (R. 326.)

**2.**      *Post Onset Date Evidence*

In August 2012, the Plaintiff saw neurologist Paula Toth-Russell, M.D., for her complaints of dizziness, and gait disturbance with falls. The Plaintiff reported that she had been doing well until an incident in July 2012 when she became dizzy and could not walk straight. After that incident, she continued to feel off balance and had multiple falls brought about by bending, turning, or changing altitude. On examination, the Plaintiff walked carefully with her head in an upright posture, and she had a limited range of motion in her neck. The Plaintiff's muscle strength and tone, sensation, and reflexes were all normal. Dr. Toth-Russell believed her symptoms could be related to peripheral dizziness, and ordered an electronystagmography (ENG) study to identify any potential nerve damage or destruction, but the Plaintiff's ENG study was unremarkable.

On the recommendation of Dr. Toth-Russell, the Plaintiff participated in therapy to improve her balance from August to December 2012 (R. 350–70, 378). By the time of her discharge in October 2012, the Plaintiff's posturography score had improved by 20% and was in

the normal range for her age (R. 351). The Plaintiff reported doing more activity and driving independently, but she still reported a moderate level of perceived impairment. When the Plaintiff was discharged from therapy in December 2012, she was much improved and her perceived dizziness improved from severe to moderate.

In September 2012, the Plaintiff continued her pain treatment and underwent epidural injections with Drs. Stillwagon and Graham, but in November 2012, she went to Dr. Higgs-Coulthard for a general check up with no specific complaints and had a normal examination.

The Plaintiff had a consultative exam in December 2012 at the request of the state agency. Dr. Maureen Ziboh, M.D., conducted the examination. The Plaintiff complained of pain in her neck, not being able to stand for more than one hour, thumb pain, and shortness of breath. The Plaintiff was 5'5" tall and weighed 230 pounds at the time of examination. Her examination was entirely unremarkable, including a normal gait, normal muscle strength and tone, normal range of motion in every part of her spine and major joints, no difficulty with buttoning, zipping, or picking up coins, and no stiffness or inflammation. A Pulmonary Function Test was also within normal ranges.

In December 2012, the Plaintiff followed up with Dr. Stillwagon with complaints of more pain in her left wrist and hand. Dr. Stillwagon prescribed a Medrol Dosepak for the Plaintiff's pain. In January 2013, Dr. Stillwagon referred the Plaintiff to a surgeon, Thomas Mango, M.D., for her continued complaints of neck pain. Dr. Mango reviewed the Plaintiff's x-ray, which showed multilevel degenerative disc disease, and MRI, which showed multilevel disc desiccation, minimal disc bulging, multilevel facet arthrosis, and stenosis. After reviewing the

tests and the Plaintiff's history of conservative treatment, Dr. Mango recommended surgery.

In January 2013, the Plaintiff had a second consultative examination at the request of the state agency. The Plaintiff told consultative examiner, Dr. Victor Elgabalawi, that she had pain from her lung surgery, shortness of breath, diabetes, high blood pressure, and acid reflux. She reported having good exercise tolerance, but difficulty with stairs. The Plaintiff noted relief from pain medication. She also reported being able to drive for two hours, stand for one hour at a time and three hours over the course of eight hours, and being able to complete all of the household chores without difficulty, including sweeping, mopping, and vacuuming. She could shop without help, and cook and wash dishes in short intervals. On examination, the Plaintiff's only abnormality was a limited range of motion in her neck.

In February 2013, Dr. Mango performed a cervical fusion operation (R. 489–90). During follow-up, Dr. Mango commented that the Plaintiff was doing well and experiencing normal postoperative pain. Although the Plaintiff complained of shoulder pain, an x-ray did not reveal dislocation, so Dr. Mango believed it was most likely nerve pain and prescribed Medrol Dosepak. That same month, the Plaintiff began treatment with Randolph J. Ferlic, M.D., for her complaints of right hand and thumb pain. Dr. Ferlic administered an injection and recommended an outpatient surgical procedure.

In March 2013, the Plaintiff returned to her oncologist, Dr. Ansari, for her yearly checkup. He reported that the Plaintiff was healing well from the recent neck surgery performed by Dr. Mango. The Plaintiff also had an appointment with Dr. Higgs-Coulthard and reported not being able to lift her right arm above her shoulder. Dr. Higgs-Coulthard noted the Plaintiff's somewhat poor coordination with her right arm and passive range of motion, but also noted that

the Plaintiff was receiving therapy and improving.

The Plaintiff continued to participate in physical therapy after her neck surgery and noted significant improvement in her right shoulder. She was independent with her activities of daily living and had a normal range of motion, although her right shoulder strength was still decreased. By August 2013, Dr. Mango's musculoskeletal findings were normal. Although the Plaintiff complained of weakness in her right arm, Dr. Mango found no focal motor weakness on examination.

The Plaintiff saw Dr. Higgs-Coulthard in June 2013, complaining of right knee pain for the previous three weeks. Dr. Higgs-Coulthard recommended an MRI based on effusion in the Plaintiff's right knee. The MRI revealed a partial tear in her medial meniscus, for which Dr. Higgs-Coulthard recommended arthroscopy. In July 2013, the Plaintiff underwent arthroscopic surgery to repair the torn meniscus. In August 2013, the Plaintiff saw Dr. David Bankoff for follow-up, where he noted that her condition was much improved, and that she had responded well to physical therapy. The Plaintiff was to continue physical therapy and follow-up in four to six weeks only if she was having problems.

In October 2013, the Plaintiff underwent surgery on her thumb, and she continued with therapy and follow-up appointments with Dr. Ferlic until December 2013. In December 2013, she reported slight improvement and more pain than expected. Dr. Ferlic's examination was normal and he prescribed pain medication. He also noted that the Plaintiff was progressing favorably and should follow up in three months.

**B.      Opinion Evidence**

After examining the Plaintiff in December 2012, consultative examiner Dr. Ziboh opined that the Plaintiff, who wore a hand brace, could not stand or walk for at least 2 hours in an 8-hour day, and was unable to use her unoccupied arm for lifting and carrying less than 10 pounds or over 10 pounds occasionally. Dr. Ziboh then opined that the Plaintiff was able to sit, stand, walk, lift, handle objects, hear, see, speak, understand, remember, sustain concentration, persist, and interact socially.

After the January 2013 consultative exam, Dr. Elgabalawi opined that the Plaintiff had no postural, manipulative, communicative, or environmental restrictions.

In January 2013, state agency reviewing physician, Mangala Hasanadka, M.D., opined that the Plaintiff could perform light work, but could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, as well as balance, stoop, kneel, crouch, or crawl. Dr. Hasanadka also opined that the Plaintiff should avoid concentrated exposure to fumes, dusts, gases, odors, pulmonary irritants, and noxious fumes. One month later, state agency reviewing physician, Fernando R. Montoya, M.D., affirmed Dr. Hasanadka's opinion.

In August 2013, the Plaintiff's treating orthopedic surgeon, Dr. Mango, opined that the Plaintiff had no restrictions on her activity.


**C.      Hearing Testimony**

The Plaintiff testified that she was unable to work due to dizziness, pain in her thumbs, pain in her ribs, difficulty gripping with her hands, and shortness of breath when climbing stairs. According to the Plaintiff, she moved slowly due to dizzy spells, which occurred about every

other day and lasted about 5 to 10 minutes, and she was unable to walk on uneven surfaces.

With regard to her daily activities, the Plaintiff testified that she needed help around the house and kitchen and was unable to unscrew lids, open things easily, or carry objects such as laundry baskets. She noted that she often relied on her husband for help around the house, and was able to do some self-care and housework, but she needed to do it slowly and with breaks. The Plaintiff testified that she was able to drive, but did not do so often. She stated that she spent time at the gym doing exercises three to four times per week, including pool therapy for her neck, hand, and knee.

The Plaintiff explained that she left her job as a cashier at CVS due to dizziness and not being able to sit while working. Budget cuts caused her to stop working as a paraprofessional and reading teacher. The Plaintiff stated that she tried working for her sister-in-law at a laboratory about eight hours per day, one day per week, for two months, where she had to screw caps on vials and move trays, and noted that she was in pain after working.

The Vocational Expert (VE) classified the Plaintiff's past work, including her jobs as a supervisor cashier, bookkeeper, cashier/checker, teacher aide or paraprofessional, and reading teacher. The VE testified that according to the Dictionary of Occupational Titles (DOT), each of these jobs was either at the sedentary or light exertional level as generally performed.


**D.     ALJ Decision (Five-Step Evaluation)**

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 42 U.S.C. § 423(d)(1)(A) (defining a disability under the Social Security

Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); *id.* § 423(d)(2)(A) (an applicant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy"). The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA, so she moved to the second step, which is to determine whether the claimant had a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ determined that the Plaintiff's severe impairments are history of lung tumor with residuals, obesity, status-post cervical fusion with residuals, status-post right knee arthroscopy, and arthritis in her thumbs. The ALJ concluded that the Plaintiff had other, non-severe impairments, such as history of gait disturbance, right carpal tunnel syndrome, hypertension, diabetes mellitus, GERD, and hyperlipidemia.

At step three, the ALJ considered numerous impairment listings to determine whether the Plaintiff impairments, or combination of impairments, met or medically equaled the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes SGA. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ concluded that the Plaintiff's impairments did not to meet or equal a listed impairment.

Next, the ALJ was required, at step four, to determine the Plaintiff's residual functional

capacity (RFC), which is an assessment of the claimant's ability to perform sustained

work-related physical and mental activities in light of her impairments. SSR 96–8p, 1996 WL

374184, at *1 (July 2, 1996). The ALJ concluded that the Plaintiff had the RFC to perform light

work as defined in 20 C.F.R. § 404.1567(b), except that she could only occasionally climb

ladders, ropes, scaffolds, ramps, and stairs, and occasionally balance, stoop, kneel, crouch, and

crawl. The Plaintiff could frequently handle and finger bilaterally.[1] In making these findings, the

ALJ considered the Plaintiff's testimony regarding her symptoms but did not find entirely

credible her statements concerning the intensity, persistence, and limiting effects of those

symptoms. The ALJ considered the Plaintiff's treatment history with Drs. Mango, Higgins-

Coulthard, Bankoff, and Ferlic, and the results of the consultative examinations. She noted the

positive results of neck, thumb, and knee surgeries, medications, and treatments. The ALJ also

considered the Plaintiff's activities of daily living, which included her testimony from the

hearing as well as her reports to doctors.

    At the final step of the evaluation, the ALJ determined that the Plaintiff could perform

her past relevant work as a supervisor cashier, a bookkeeper, cashier/checker, a paraprofessional,

and a reading teacher. These jobs were typically performed at the sedentary and light levels, and

they would not require that she perform activities that were precluded by her RFC.

---

[1] In assessing the Plaintiff's RFC, the ALJ stated that she "can have frequent exposure to
pulmonary irritants, such as fumes, odors, dust, gases, and poorly ventilated areas." (R. 15.) This appears
to be the opposite of what the ALJ intended, as she gave some weight to the opinions of the consultative
examiners because they were somewhat consistent with the record, which included the fact that the
Plaintiff "has environmental limitations because of the residuals from her lung tumor that caused some
shortness of breath." (R. 19.) In any event, the Plaintiff does not challenge this portion of the ALJ's
decision, and her past relevant work does not appear to involve exposure to such irritants.

### E.    Post-Hearing Evidence

As part of her request for review to the Appeals Council, the Plaintiff presented a statement on a prescription pad from neurologist Dr. Toth-Russell, dated September 4, 2012. Dr. Toth-Russell stated that Plaintiff was "restricted to only sedentary work" and "should not be ambulatory at work due to risk of falls." (R. 682.) This statement was not included in the documentation the ALJ reviewed.


## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the

court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

### A.      Mental Functional Limitations

The Plaintiff alleges that the ALJ failed to properly develop and consider her mental functioning. The Plaintiff asserts that she has a "severe psychological impairment which, in combination with her physical impairments, causes significant limitations of her ability to perform work-related mental functions." (Pl.'s Br. 9.) The Plaintiff faults the ALJ for not even mentioning her depression, or analyzing whether her pain, medication side effects, fatigue, and depression caused any impairment in her ability to perform the basic mental demands of her past relevant work or unskilled work. The Plaintiff maintains the she was "diagnosed with depression by a physician and repeatedly reported depression in paperwork submitted to the Agency and her treating sources." (*Id.* (citing R. 177, 186, 302, 353, 363, 370, 570–71).)

The ALJ must connect the dots between the claimant's impairments, as supported by

substantial evidence in the record, and the RFC finding. *Young v. Barnhart*, 362 F.3d 995, 1002–03 (7th Cir. 2004). "[A]n ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). Moreover, symptoms "alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528; *id.* § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."). Accordingly, the Plaintiff's self reports to the Agency about being depressed did not require mention by the ALJ. Further, the Court could locate no diagnoses of depression by any physician or treating source. The Plaintiff cites to one reference in the record where a physician indicated that the Plaintiff had a history of depression (R. 302 (Dr. Stillwagon letter in response to referral from Dr. Ansari to address neck, back, and rib pain)), and to the only instance in the record in which a treating or examining physician described her mood and affect as "depressed" (R. 570–71). The only other citations are, again, to self reports of sometimes being depressed because of her dizziness (R. 353, 363, 370). The Plaintiff did not mention depression in the five other visits she had with her primary care physician during the relevant period (R. 254–58, 428–32, 554–58, 560–67). She made no mention of it to either consultative examiner (R. 381–90, 393–97). During the hearing, the Plaintiff did not testify to any depression or mental impairments, and she has received no mental health treatment or counseling. While the Plaintiff made some complaints about medication side effects, adjustments were made to her medications, and there is no indication that this was an ongoing issue.

The Plaintiff's evidence consists solely of the records of her symptoms, not records of

observable facts or diagnostic tests. Symptoms "alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528(a). Accordingly, the Plaintiff did not show that her mental functioning established a reasonable probability of the existence of an impairment, and the ALJ did not commit an error of law by failing to discuss it.

## B.    Credibility

The Plaintiff claims that remand is necessary because the ALJ neglected to consider important factors in evaluating her credibility, offered reasons that were not legitimate, failed to explain how her observations supported her conclusions, and omitted favorable credibility factors.

An ALJ is in the best position to determine the credibility of witnesses, and a credibility determination will be overturned only if it is patently wrong. *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, when "the determination rests on 'objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision.'" *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (brackets omitted) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Additionally, if the ALJ does not make explicit findings and does not explain them in a way that affords meaningful review, the ALJ's credibility determination is

not entitled to deference. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). To evaluate

credibility, an ALJ must consider the entire case record and give "specific reasons for the weight

given to the individual's statements." SSR 96-7p, 1996 WL 374186, at 4.[2] The ALJ should look

to a number of factors to determine credibility, such as the objective medical evidence, the

claimant's daily activities, allegations of pain, aggravating factors, types of treatment received,

medication taken, and functional limitations. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)

(first citing 20 C.F.R. § 404.1529(c)(2)–(4); then citing *Prochaska*, 454 F.3d at 738).

In assessing the Plaintiff's statements about her symptoms, the ALJ specifically

mentioned the Plaintiff's allegation that her husband helps with the majority of the chores

because of her physical limitations, and her statement that she does housework in chunks

throughout the week but cannot lift certain items. The ALJ also noted that the Plaintiff testified

that she went to the grocery store with her husband and to the gym three to four times per week.

However, the ALJ also noted that, at the January 2013 consultative exam, the Plaintiff stated that

she could do household chores, including sweeping and vacuuming, and also indicated that she

cooked and went grocery shopping. The ALJ asserted that, throughout the record, the Plaintiff

noted that she exercised three or more times a day. Additionally, Dr. Elgabalawi found that the

Plaintiff had good exercise tolerance.

The Plaintiff argues that, by relying on her "daily activities and prescribed home

exercises as evidence of the ability to work . . . [the ALJ] committed a common legal error by

failing to recognize 'the critical differences between activities of daily living and activities in a

---

[2] Social Security Ruling 16-3p, effective March 16, 2016, has superseded Social Security Ruling 96-7p. For purposes of stating that the ALJ must give specific reasons for the weight given to a claimant's statements, the changes do not matter.

full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons.'" (Pl.'s Br. 11 (first citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); then citing *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005); and then citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007).) The ALJ did not commit this error; although the ALJ summarized the Plaintiff's activities, she did not ignore the limiting scope of those activities or infer from those statements that the Plaintiff was therefore capable of full time work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work). The ALJ did note inconsistencies between the limitations the Plaintiff described in her testimony and the statements she made to medical sources, which was entirely appropriate. *See Elder*, 529 F.3d at 414 ("It was well within the ALJ's authority to disregard [the [plaintiff's] testimony because it conflicted with what she told [her doctor].").

The Plaintiff also argues that the ALJ "did not mention [her] good work history," which should have lent substantial credibility to her claim that she was unable to work due to disability. (Pl.'s Br. 12.) Although the Seventh Circuit has said that ALJs should look favorably on a claimant's good work record, *see Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), it has said that "work history is just one factor among many, and it is not dispositive," *Loveless*, 810 F.3d at 508 (noting that other factors provided substantial support for adverse credibility finding). Unlike in *Hill*, here, the ALJ did not find that the Plaintiff's work history, or her attempts to find work, negatively impacted her credibility. 807 F.3d at 868 (criticizing as "backward" the ALJ's reasoning that, because the plaintiff wanted to work and performed manual labor after her neck surgery, she was exaggerating about her neck pain). Instead, the ALJ's credibility finding rests

on a number of inconsistencies undermining the Plaintiff's complaints that pain and fatigue prevent her from working. For example, the Plaintiff testified that she suffers from arthritis in her thumbs that affects her fine manipulation and grip strength. The ALJ considered the Plaintiff's arthritis in her thumb to be a serious medical impairment, but also noted that the medical records showed no complaints of thumb pain until February 2013, and Dr. Ferlic found that the Plaintiff had good sensation and range of motion following thumb surgery. Moreover, just prior to her complaining of thumb pain, both consultative examiners determined that the Plaintiff had normal grip strength and intact fine finger manipulation. Her thumb x-ray also showed good positioning.

The Plaintiff stated that she suffers from pain in her ribs and stiffness in her neck. The ALJ noted that there was no specific treatment for rib pain, and that the Plaintiff made only minimal complaints at the consultative examinations. At the hearing, the Plaintiff testified that medication provided pain relief. With regard to her neck, the ALJ cited the pain following the cervical fusion, but also noted Dr. Mango's assessment of improvement and August 2013 release with no restrictions on activity. Additionally, her x-ray showed intact hardware. Based on the record, the ALJ thought the Plaintiff's neck pain caused decreased mobility and would limit her to light work with occasional postural limitations.

The ALJ acknowledged the Plaintiff's statement that her right knee tended to become swollen and stiff. However, the record also revealed that the Plaintiff only began complaining of knee pain in June 2013, and that she had immediate improvement following her July 2013 arthroscopy. The records did not include any continued recommendation to elevate her knee. However, the ALJ found that the residual knee pain did warrant climbing and postural limitations.

The Plaintiff also testified that she had trouble climbing stairs due to shortness of breath. The ALJ acknowledged that the Pulmonary Function Test showed some restriction, but that the only treatment was an inhaler. The ALJ thought the shortness of breath would require environmental limitations.

The Plaintiff accuses the ALJ of cherry picking evidence to support her findings. The Court does not agree. The ALJ's decision does not ignore the Plaintiff's numerous surgeries or her complaints of pain. It simple weighed these against the treatment records that evidenced improvement following surgery, treatment, or medication, as well as against normal examination findings and test results. The Plaintiff has, essentially, asked this Court to reweigh the evidence. But the ALJ's credibility assessment is tied to evidence in the record and is not patently wrong, so the Court will not disturb that assessment. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Pepper*, 712 F.3d at 367.

### C.      Obesity

The Plaintiff asserts that the ALJ failed to consider the exacerbating effects of her obesity upon the severity of her symptoms and limitations. She argues, "[t]he ALJ did not discuss whether she believed the obesity exacerbated the other severe and nonsevere impairments, which violates SSR 01-2p and requires remand." (Pl.'s Br. 13.)

The Plaintiff is correct that obesity can aggravate multiple aspects of health, including chronic musculoskeletal system diseases and mental health. SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). However, the Plaintiff does not indicate what the ALJ specifically missed in the assessment of her functional limitations as it relates to her obesity, or otherwise explain how her

obesity would have affected the ALJ's decision. The ALJ found that the Plaintiff's obesity was a severe impairment, which means that it "alone or in combination" with the Plaintiff's other medically determinable impairments significantly limited her "physical or mental ability to do basic work activities." *Id.* The ALJ considered the treatment records of various doctors, all of whom were aware of the Plaintiff's obesity. *See Pepper*, 712 F.3d at 365 (error in failing to specifically discuss functional limitations resulting from obesity when formulating the RFC was harmless where RFC was based on "limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments" and the plaintiff did not specify how her obesity further impaired her ability to work). Moreover, in determining the Plaintiff's RFC, the ALJ limited the Plaintiff "to light work with occasional postural limitations because of her decreased mobility due to her weight and following her cervical fusion." (R. 19.) The ALJ also assessed climbing and other postural limitations because of continued stiffness and pain in the Plaintiff's right knee. Whether the ALJ explicitly found that the Plaintiff's weight contributed to this continued pain is not reversible error, particularly where the Plaintiff has provided nothing that would suggest her obesity caused greater exacerbation that what was already noted.

### D.     Vocational Findings

The Plaintiff alleges that the ALJ erroneously found that she could perform the mental and physical demands of her past relevant work (PRW) as a supervisor cashier (DOT# 211.137-010), bookkeeper (DOT# 210.382-014), cashier/checker (DOT# 211.462-014), paraprofessional (DOT# 249.367-074), and a reading teacher (DOT# 099.327-010) without

engaging in the analysis required by SSR 82-62 and 20 C.F.R. § 404.1565(a). Instead, the

Plaintiff argues, the ALJ delegated her duty to assess and analyze the Plaintiff's past work and

her ability to perform it to a vocational expert.

In the end, the Plaintiff's argument on this point is dependent on her claim that the ALJ

failed to include all of her limitations in the RFC. She argues:

> Had the ALJ engaged in the appropriate analysis, she would have discovered that
> only two of the jobs meets the requirements of PRW – and one of the jobs
> identified is a composite job (which requires separate analysis) and the other [the
> Plaintiff] could not perform due to limitations the ALJ neglected to perform in her
> residual functional capacity.

(Pl.'s Br. 14.) Because the ALJ's RFC determination was supported by substantial evidence, her

hypothetical to the vocational expert reflected all of the credible limitations, which is all that is

required. *Schmidt*, 496 F.3d at 846.("[T]he ALJ is required only to incorporate into his

hypotheticals those impairments and limitations that he accepts as credible."). Accordingly, the

Court finds no basis for remand.


**E.     New Evidence**

The Plaintiff argues that the post-decision evidence she submitted to the Appeals Council

requires a remand or reversal. The evidence is a statement on a prescription pad from neurologist

Dr. Toth-Russell, who saw the Plaintiff in August 2012 for her complaints of dizziness. The

statement, dated September 4, 2012, is that the Plaintiff was "restricted to only sedentary work,"

and "should not be ambulatory at work due to risk of falls." (R. 682.)

The Appeals Council will grant review of an ALJ decision when additional evidence is

submitted that is new and material, and that relates to the period on or before the ALJ's decision,

and if the Appeals Council finds that the entire record, including the additional evidence, suggests that the ALJ's actions, findings, or conclusion is contrary to the weight of the evidence. 20 C.F.R. § 404.970(b). The Agency's process for considering post-decision evidence is sequential. First, the Appeals Council must consider whether post-decision evidence is new, material, and relevant to the adjudicated time period. If so, the Appeals Council must then evaluate the entire record, including the additional evidence. If after a review of the entire record, including the newly submitted evidence, the Appeals Council finds that the ALJ's decision appears to be contrary to the weight of the entire record, it proceeds to a full review of the case. *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997) (citing 20 C.F.R. § 404.970(b)).

If the Appeals Council concludes that the ALJ's decision is not "contrary to the weight of the evidence," including the additional evidence, it issues an order denying review. *Perkins*, 107 F.3d at 1294. An order denying review at this step of the process is discretionary and unreviewable. *Id.* However, the Appeals Council's determination is reviewable where its language is not sufficiently clear whether the Appeals Council denied review because it found that the evidence was not new and material, or because the additional evidence did not render the ALJ's decision contrary to the weight of the evidence. *Stepp v. Colvin*, 795 F.3d 711, 725 (7th Cir. 2015). In that case, the court undertakes a limited review to determine whether the Council had erroneously concluded that the newly submitted evidence was not new and material. *Id.* at 723.

Here, the Appeals Council acknowledged receipt of Dr. Toth-Russell's opinion but found that the information in the record did "not provide a basis for changing the [ALJ's] decision." (R.

2.) The Appeals Council's letter communicating its denial of review referred to its order entered the same day, which identified a statement from the Plaintiff's attorney and Dr. Toth-Russell's opinion, and added those statements to the administrative record. The Defendant suggests that this means the Appeals Council considered the evidence and its decision not to engage in plenary review is not reviewable. Like the decision in *Stepp*, the Court finds that the Appeals Council's decision in this case was too minimal to allow the Court "to determine with any confidence that the Council accepted [the doctor's] notes as new and material evidence," *Stepp*, 795 F.3d at 725, and thus considers whether the conclusion that the newly submitted evidence was not new and material was erroneous.

The Defendant argues that, even if *Stepp* controls to allow review, the Appeals Council's denial of review does not require a remand. First, the Defendant argues that Dr. Toth-Russell's opinion is not new because it existed and was available to the Plaintiff at the time of the hearing. *See Perkins*, 107 F.3d at 1296 (new means "not in existence or available" (first quoting *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993); then quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990))). The opinion, dated September 4, 2012, was written more than a year before the Plaintiff's hearing, so there is no dispute that it was in existence. The Plaintiff argues that the opinion was new because it was not available to her at the time of the hearing and decision. She maintains that the September 2012 opinion was not produced in response to a records request "and was not obtained until later when its absence was discovered by [the Plaintiff]." (Pl.'s Br. 8.) The Plaintiff contends that she reasonably believed her submitted records included the September 2012 work restrictions.

The Court need not decide whether counsel's argument before this Court is sufficient to

establish that the opinion was not "available" because the Court finds that the evidence is not material. To be considered material, evidence must create a "reasonable probability that the Commissioner would have reached a different conclusion" if it had been considered. *Stepp*, 795 F.3d at 725; *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). The Plaintiff argues that the ALJ would have been required to consider Dr. Toth-Russell as a treating physician. The Defendant counters that the record shows that Dr. Toth-Russell only examined the Plaintiff once, in August 2012. That examination occurred shortly after the Plaintiff's July 2012 incident when she became dizzy and could not walk straight. The Court's review of the record confirms that Dr. Toth-Russell would not have been considered a treating source. *See* 20 C.F.R. § 404.1502 (A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you.").

The Defendant also argues that Dr. Toth-Russell's opinion was not well-supported by the evidence, and that the ALJ discussed the contrasting evidence, such as objective evidence including an unremarkable ENG, improvement with therapy, and lack of complaints of dizziness or gait disturbance after therapy ended. The Court agrees. There is nothing in the record to suggest that the ALJ would have arrived at a different conclusion had she considered the weight to assign to Dr. Toth-Russell's opinion about ambulating. *See* 20 C.F.R. § 404.1527(d)(3)–(6). The post-hearing evidence does not require that this case be remanded.

## CONCLUSION

For the reasons stated above, the decision of the Commissioner is AFFIRMED.

SO ORDERED on September 8, 2016.

_s/ Theresa L. Springmann_____

THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION